[L. A. No. 3333. In Bank.—March 13, 1915.]

## AUGUSTA Z. NICHOLS et al., Appellants, v. W. F. McCULLOM et al., Respondents.

PUBLIC LANDS — RESURVEY OF LANDS IN SAN DIEGO COUNTY — ACT OF CONGRESS OF JULY 1, 1902—NEW SURVEY SUPERSEDES OLD—BOUNDARIES OF SCHOOL LANDS.—Under the act of Congress of July 1, 1902, providing for a resurvey of a specified township in San Diego County (now Imperial County), to cure the obliterations of the monuments appearing on the field notes of the original survey of 1856, the new survey supersedes the old one, and regulates the disposition of the public lands within the area affected as to all persons not in the actual occupancy of the land; and unoccupied sixteenth and thirty-sixth sections passing to the state of California upon the approval of the old survey are governed, in the respect of their boundaries, by the resurvey.

ID.—CONTROL OF CONGRESS OVER PUBLIC LANDS.—There is no constitutional objection to that act. The public lands are under the exclusive control of Congress, until title or a right to acquire title has, pursuant to some law, vested in some person or body corporate other than the United States.

APPEAL from a judgment of the Superior Court of Imperial County. F. J Cole, Judge.

The facts are stated in the opinion of the court.

Leroy A. Wright, Wright & Winnek, W. H. Larew, J. S. Larew, C. F. Holland, and Powers & Holland, for Appellants.

Eshleman & Swing, Phil D. Swing, and Conkling & Brown, for Respondents.

SLOSS, J.—This action was brought to recover possession of a tract of land in Imperial County, with damages for the withholding. There was a jury trial, which resulted in a verdict in favor of defendants. From the judgment entered pursuant to the verdict the plaintiffs' appeal, bringing up the evidence by means of a bill of exceptions.

The land in controversy is described as fractional section 16, of fractional township 17 south, range 15 east, San Bernardino base and meridian, containing 441.96 acres more or less. The land thus described was originally public land of

the United States, and being a sixteenth section, it passed
from the United States to the state of California as a part
of the school land grant. It is not disputed that the plain-
tiffs have acquired the state title as successors to the holders
of a patent from the state, dated January 12, 1903. Nor is
it questioned that the defendants are in possession of land
which, according to the claim of plaintiffs, forms a part of
the section granted by the state patent. The real point of
contention is whether the plaintiffs have succeeded in estab-
lishing the identity of the land occupied by defendants with
fractional section 16 of township 17 south, range 15 east,
San Bernardino base and meridian. In other words, the
defendants took at the trial and now take, the position that,
while the plaintiffs are unquestionably the owners of that
section, the proof fails to show that the land claimed and
withheld by the defendants is within the section thus de-
scribed. The jury, by returning a verdict for the defend-
ants, determined this issue in their favor. The appellants
attack the sufficiency of the evidence to support the verdict,
and assign as error certain instructions of the court.

The tract in controversy, with neighboring land, located
in what is known as Imperial Valley, was originally surveyed
under the authority of the government of the United States
in 1856. The survey was approved, and the approved plat
filed in the department of the interior and in the local land-
office in 1857. It is a matter of common knowledge, and is,
in fact, sufficiently shown by the record in this case, that the
land embraced in this survey, or the greater part thereof,
remained unoccupied for many years. When it was dis-
covered that the apparently barren lands in Imperial Valley
could be rendered exceedingly productive by means of irri-
gation, an extensive settlement of the valley began. By that
time the monuments referred to in the field-notes of the
survey of 1856 had, to a great extent, been obliterated, and
it was difficult, and in many cases impossible, to trace upon
the ground the boundaries of the governmental subdivisions
as established by the survey. Moved, no doubt, by the
knowledge of these conditions, the Congress of the United
States passed an act, entitled "An act providing for the re-
survey of certain townships in San Diego County, Califor-
nia." (The land is within the territory which has, since the
passage of the act, been taken from San Diego County to

form the new county of Imperial.)   By this act, which was
approved July 1, 1902, it was enacted "that the secretary of
the interior be, and he is hereby authorized to cause to be
made a resurvey of the lands of San Diego County, in the
state of California, embraced in and consisting of the tier of
townships 13, 14, 15 and 16 south, of range 11, 12, 13, 14, 15
and 16 east, and the fractional township 17 south, of range
15 and 16 east, all of San Bernardino base and meridian
. . . ; provided, that nothing herein contained shall be so
construed as to impair the present *bona fide* claim of any
actual occupant of any of said lands to the lands so occupied."

Pursuant to this law resurveys of the townships described
were ordered.  Among others, instructions for surveying
township 17 south, range 15 east, were issued to Legrand
Friel, United States Deputy Surveyor.  Mr. Friel made his
survey, and filed his returns with the surveyor-general.
They were transmitted to the general land-office for its ap-
proval.  Such approval was refused for reasons stated in a
decision of the commissioner of the general land-office, who
returned the papers to the surveyor-general for California
with directions to except from approval the establishment of
the alleged school sections, the commissioner stating that the
sixteenth and thirty-sixth sections in each of the townships in-
volved would be "platted and located in conformity with the
claim lines of adjacent sections as shown by the resurvey."  A
corrected survey and plat were made, and were duly ap-
proved.  The record contains a decision of the commissioner,
under date of November 4, 1910, adjudging that "tract 159"
is a school section represented upon the plat of resurvey, i. e.,
section 16 of township 17.  At the trial the defendants ad-
mitted that they were occupying "the tract of land on that
map as section 16 by the new survey"—the land "marked as
tract 159 on the plat."

It should be added that at the date of the approval of the
act providing for a resurvey (July 1, 1902), the defendants
had not gone into possession of the land, and had taken no
steps toward acquiring any title thereto.  They were not,
therefore, within the scope of the proviso with which the
enactment ends.

On the foregoing evidence, none of which is disputed, it
seems clear that the plaintiffs made out a complete case of
ownership and right of possession of the land in controversy,

and that the verdict of the jury against their claim is unsupported.

The act of July 1, 1902, authorized the secretary of the interior to cause to be made a resurvey of certain townships. As we have already pointed out, the lines of the original survey could not with certainty be traced upon the ground. The purpose of the congressional enactment undoubtedly. was that the new survey directed to be made should supersede the old one which had become unavailable. It was intended that the dispositions of the public lands within the area affected should be regulated by the new survey, which, in theory at least, would reproduce the exact corners and lines of the old one. The Congress recognized, however, that some of these lands were held by occupants who claimed or might claim vested rights. Such claims were expressly saved from the effect of the act by the proviso at the end. But the very fact that this proviso was inserted lends added force to the view that, as to all persons not then in occupancy of any of the lands, the resurvey was intended to be binding. We see no constitutional objection to such an enactment. The public lands are under the exclusive control of Congress, until title or a right to acquire title has, pursuant to some law, vested in some person or body corporate other than the United States. A person who claims no right in such public lands certainly cannot object to the act of Congress in abandoning a survey already made, and substituting another in its place. This would be true even if the monuments of the original survey were readily discoverable. The power of Congress to provide for a resurvey is much clearer where, as here, it has become impossible or exceedingly difficult to make a correct application of the original survey.

But, say the respondents, the sixteenth and thirty-sixth sections were identified by the survey of 1856, and, upon the approval of that survey, they at once passed to the state of California. (*Higgins* v. *Houghton*, 25 Cal. 252; *Sherman* v. *Buick*, 45 Cal. 656.) They then, it is argued, ceased to be public lands, and the power of the federal government to exercise any control over them, by survey or otherwise, ceased. But the location of these sections was necessarily dependent upon the location of the adjoining sections of public land still undisposed of. In delimiting the boundaries of the adjoining sections, it was necessary that the boundaries of the school sections

should be marked out and determined. Furthermore, this contention, it seems to us, can hardly be urged against the appellants who are accepting the resurvey as accurately describing the land owned by them. Such appellants might, perhaps, be in a position to attack the resurvey on the ground that its effect was to take from them land to which they already had title. But they are the only parties entitled to make this point. When they rely upon the resurvey as an accurate designation of the school section owned by them, the respondents, who do not claim under the state, and who were not making a claim of any kind when the statute authorizing the survey was passed, cannot object. If, according to the survey of 1856, the land in controversy was the sixteenth section, the appellants have a perfect title to it, and the respondents clearly have neither title nor right of possession. If it was not school land, it remained public land of the United States, and subject to the jurisdiction of Congress. In that aspect, the resurvey was unquestionably authorized, and the respondents can have no valid claim to land which was identified by the resurvey as school land which belonged to the state or its grantees and was accordingly not open to entry.

The authorities cited by respondents to the effect that the land department has no authority by means of a resurvey or otherwise to affect the title to land after such title has passed from the government to its grantees (*Moore* v. *Robbins,* 96 U. S. 530, [24 L. Ed. 848] ; *Kean* v. *Roby* 145 Ind. 1021, [42 N. E. 1012] ; *Murphy* v. *Kirwan,* 103 Fed. 104) have no application to the facts of this case. In none of these cases had there been congressional authorization to make a resurvey which should take the place (so far as claims to be thereafter initiated were concerned) of an existing survey.

If the act of 1902 has been rightly interpreted by us, there is no occasion to consider the argument of respondents to the effect that the decision of the land department of the government fixing the location of section 16 was erroneous and that said section was placed by the new survey at a different place from that occupied by section 16 under the survey of 1856. The new survey superseded the old one. Parties going upon the land after the passage of the act, and with constructive knowledge of the fact that such survey was to

be made, took the chance that such survey might establish that the land occupied by them was a school section and not subject to entry as vacant lands of the United States.

The foregoing views make it unnecessary to consider specifically the various points made by appellants in attacking rulings on evidence and instructions to the jury. These questions can readily be solved by the application of the principles outlined in this opinion. Nor need we discuss the claim that the court erred in overruling plaintiff's challenge to a juror. The same situation will not, in all likelihood, be presented on a new trial.

The judgment is reversed.

Shaw, J., Henshaw, J., Lorigan, J., Melvin, J., and Angellotti, C. J., concurred.